THOMAS LANE ET AL. *v.* COMMISSIONER OF
ENVIRONMENTAL PROTECTION
(AC 33346)

DiPentima, C. J., and Gruendel and Robinson, Js.

Argued March 15—officially released June 5, 2012

*Tracey Lane Russo,* for the appellants (plaintiffs).

*John M. Looney,* assistant attorney general, with whom, on the brief, was *George Jepsen,* attorney general, for the appellee (defendant).

GRUENDEL, J. The plaintiffs, Thomas Lane and Gail Lane, appeal from the judgment of the Superior Court dismissing their appeal from the declaratory ruling issued by the defendant, the commissioner of environmental protection. In that ruling, the defendant concluded that the department of environmental protection (department), through its office of Long Island Sound Programs (office), properly issued a notice of violation for maintaining an unauthorized dock and boardwalk on the plaintiffs' property and properly denied the plaintiffs' subsequent application for a certificate of permission filed pursuant to General Statutes § 22a-363b (a). On appeal, the plaintiffs claim that the court improperly (1) affirmed the defendant's construction of § 22a-363b (a), (2) concluded that substantial evidence supported the defendant's determinations that the dock and boardwalk were not eligible for a certificate of permission pursuant to that statute, (3) denied their claim of equitable estoppel, (4) concluded that the declaratory ruling did not violate their littoral rights, (5) affirmed the defendant's denial of their second request for an extension of time and (6) failed to conclude that the declaratory ruling was arbitrary, capricious and characterized by an abuse of discretion. We affirm the judgment of the Superior Court.

This is an appeal about a dock and a boardwalk located on waterfront property known as 32 Money Point Road in Stonington (property). In 1937, the owner of the property, Hugh Cole, built a dock that was approximately 4 feet wide, extended 75 to 90 feet and ended in a "T" shaped pier. Cole also constructed a

pathway of cinders or gravel through the tidal marsh leading to the dock.

The record contains numerous aerial photographs of the property taken over a span of more than fifty years. As the court observed, they depict "the dock and path in various conditions since its original construction. These photographs demonstrate that the dock and pathway lacked continuity in size and configuration and at some points were not even present on the property." In her declaratory ruling, the defendant made the following specific findings with respect to those aerial photographs: "A 1951 aerial photograph shows an approximately 100 foot long pier with a timber crib[1] located at the end of a 'T' shaped pier head. There is a graded path through the marsh to the pier. A 1965 aerial photograph shows the pier in a state of disrepair without any decking. A graded path is still visible through the high marsh vegetation. A 1968 and a 1970 aerial photograph shows a pier less than 40 feet long with a cleared or graded path through the tidal marsh. A July, 1974 aerial photograph shows the graded path through the tidal marsh and a new pier/floating dock in place. The first pier section, beginning on land, is less than 50 feet long. This pier leads to a ramp, approximately 10 feet long, that leads to a floating section of dock, approximately 65 feet long, connected to a 20 foot by 10 foot 'T' float. A July, 1981 aerial photograph shows a thinner path through the marsh with encroaching vegetation. Only the first approximately 50 foot section of the pier, that begins on land, remains, in what appears to be a state of disrepair; there is no ramp, no section of floating dock and no 'T' float present. In a March, 1986 aerial photograph no pier, ramp,

---

[1] A crib is "a frame of logs or beams to be filled with heavy material . . . and sunk as a foundation or retaining wall in the building of docks, piers, dams, and similar structures . . . ." Webster's Third New International Dictionary (2002).

float or other dock structure is present. Also, the path through the tidal marsh is barely discernable as the tidal wetlands have mostly reestablished. A July, 1986 aerial photograph shows the same condition, except a 10 foot by 15 foot floating dock is situated on the waterward edge of the marsh. A July, 1990 aerial photograph shows an approximately 120 foot by 3 foot at grade wooden boardwalk placed directly on the tidal marsh. This is the first time that a wooden boardwalk appears on the marsh. The boardwalk leads to a 6 foot wide pier that begins on land and extends into the near shore waters. The pier is estimated to be 78 feet long. The pier is supported by two stone-filled cribs, approximately 8 feet by 8 feet, located at the middle and at the end of the pier. Following the pier is a ramp longer than 10 feet that leads to a floating dock that is approximately 20 feet by 10 feet in size. In a 1995 aerial photograph, a portion of the at grade walkway is missing, reducing the boardwalk to about 100 linear feet. The pier is in a state of disrepair as exposed stringers are visible. The ramp and float are still in place. In a September, 2000 aerial photograph the pier is more dilapidated than in 1995, however replacement sections of the boardwalk are visible. In a March, 2004 aerial photograph, the entire boardwalk is gone and a pier, ramp and float, consistent with the 1990 aerial photograph, are in place. A September, 2005 aerial photograph shows the pier repaired and only 80 feet of the boardwalk is present."

In September, 1985, the dock was destroyed by Hurricane Gloria and, as the owner of the property at that time attested by affidavit, "all that was left of the dock were pilings and some stringers." The dock remained in that state for a number of years until a subsequent owner, David Shiling, constructed a new dock in 1988. Although Shiling obtained a building permit from the

town of Stonington, he neither contacted the department nor submitted an application for a permit with that agency. In 1991, Shiling transferred the property to Robert Stetson and Ruth Stetson, who in turn transferred the property to the plaintiffs in October, 2004.

On March 30, 2007, department officials inspected the property. A notice of violation thereafter issued on May 7, 2007, which stated in relevant part: "[I]t appears that you have unauthorized structures comprised of a 2 foot by 82 foot plywood walk laid out atop an estuarine marsh down to a 6 foot by 51 foot pier with support pilings and two stone cribs, each 8 foot by 6 foot by 6 foot, out to a 2.5 foot by 10 foot ramp with railing and a 8 foot by 20 foot floating dock below the evidenced high tide line without authorizations required by General Statutes §§ 22a-32 and 22a-361. Please correct the above referenced violation by removing by hand all structures to a location landward of the high tide line outside of tidal wetlands within 45 days."[2]

Much discussion between the plaintiffs, their representatives and the department followed. Following a meeting with the plaintiffs, Brian P. Thompson, director of the office, encouraged the plaintiffs to submit a permit application pursuant to § 22a-361. In that letter, he stated in relevant part: "Thank you for attending the meeting held . . . on April 11, 2008. Although we did not reach an accord to resolve the matter at that meeting, we strongly encourage you to submit an application for a raised walkway and dock facility to replace the existing structures at this time as a first step towards

---

[2] In her declaratory ruling, the defendant also found that "the undisputed evidence is that the presence of both the dock and boardwalk is causing environmental degradation of the resources that I am statutorily charged with protecting." Similarly, the court noted in its memorandum of decision that "the structures [on the plaintiffs' property] not only lack a permit, but are also causing environmental harm." The plaintiffs do not challenge that finding in this appeal, which is supported by the record.

resolution. . . . Enclosed for your reference is a copy of Connecticut's residential dock guidelines. Designing a dock in accordance with these guidelines will improve the likelihood of approval. Also enclosed is some general guidance to assist you with preparing a complete application. The dock located at the adjacent property to the east is an example of the size and extent of a structure that is consistent with our standards and criteria for structures located over tidal wetlands and in coastal and tidal waters." The plaintiffs declined that invitation to submit a permit application pursuant to § 22a-361.

Instead, the plaintiffs, on July 28, 2008, filed an application for a certificate of permission to conduct "substantial maintenance" on their property "to retain and maintain" the existing dock. The application further sought permission to remove the existing at-grade 4 foot by 100 foot boardwalk and replace it with an elevated 4 foot by 152 foot wooden boardwalk. In a letter to the plaintiffs dated August 6, 2008, Thompson denied that application. He explained that because the existing structures "have not been maintained and serviceable since June 24, 1939 . . . the proposed activities do not meet the eligibility criteria for a certificate of permission . . . ."

On August 29, 2008, the plaintiffs filed a petition for a declaratory ruling with the defendant challenging both the issuance of the notice of violation and the denial of their application for a certificate of permission. In that petition, the plaintiffs argued that the activity proposed in their application was exempt from the permit requirements of § 22a-361, as it qualified for the exemption contained in § 22a-363b (a) (2) for structures in place prior to June 24, 1939, and continuously maintained and serviceable since that time.[3] The plaintiffs

---

[3] June 24, 1939, is the date on which the Structures, Dredging and Fill Act; General Statutes § 22a-359 et seq.; originally was enacted.

further alleged violations of their littoral and due process rights and advanced a claim of equitable estoppel against the department.

The defendant issued the declaratory ruling on March 20, 2009, in which she rejected the plaintiffs' claims. In so doing, the defendant concluded that pursuant to § 22a-363b (a) (2), "to be eligible for a certificate of permission, the structure in question must have not only been in place before June 24, 1939, it must have been in good repair and useable, without interruption, from June, 1939, until the time a certificate of permission is sought. . . . This case has never turned on whether each nail, plank and timber from a pre-1939 structure has remained in place, unchanged over time. Nor does the department understand the term continuously maintained and serviceable to mean that a structure must remain unrepaired from June, 1939, to the present. Rather, the term continuously maintained and serviceable must be evaluated in the facts and circumstances of each case and in this case it is clear . . . that the [plaintiffs] have not been able to demonstrate that the dock at their property was in good repair or useable, without interruption, from June 24, 1939, until they sought a certificate of permission." The defendant further found that Thompson properly denied the application for a certificate of permission because "(a) the boardwalk had not been in place prior to June 24, 1939; (b) while a dock had existed at this location before June 24, 1939, it had not been continuously maintained and serviceable; (c) for both the dock and the boardwalk the activities that the [plaintiffs] sought to be authorized under a certificate of permission went beyond rebuilding, reconstructing or reestablishing to a preexisting condition and dimension; and (d) that the dock and walkway, as presently constituted are inconsistent with the department's standards and criteria for private residential docks and are causing adverse

impacts to the environment." Pursuant to General Statutes § 4-183, the plaintiffs appealed from that decision to the Superior Court. Following a hearing, the court rendered judgment dismissing the appeal, and this appeal followed.

Before considering the plaintiffs' specific claims, we note the standard applicable to our review of administrative decisions. "Judicial review of [an administrative agency's] action is governed by the Uniform Administrative Procedure Act [(UAPA), General Statutes § 4-166 et seq.] . . . and the scope of that review is very restricted. . . . With regard to questions of fact, it is neither the function of the trial court nor of this court to retry the case or to substitute its judgment for that of the administrative agency. . . . The substantial evidence rule governs judicial review of administrative fact-finding . . . . Substantial evidence exists if the administrative record affords a substantial basis of fact from which the fact in issue can be reasonably inferred. . . . This substantial evidence standard is highly deferential and permits less judicial scrutiny than a clearly erroneous or weight of the evidence standard of review. . . . The burden is on the [plaintiff] to demonstrate that the [agency's] factual conclusions were not supported by the weight of substantial evidence on the whole record. . . .

"Even as to questions of law, [t]he court's ultimate duty is only to decide whether, in light of the evidence, the [agency] has acted unreasonably, arbitrarily, illegally, or in abuse of its discretion. . . . Conclusions of law reached by the administrative agency must stand if the court determines that they resulted from a correct application of the law to the facts found and could reasonably and logically follow from such facts. . . . Ordinarily, this court affords deference to the construction of a statute applied by the administrative agency empowered by law to carry out the statute's purposes.

. . . Cases that present pure questions of law, however, invoke a broader standard of review than is ordinarily involved in deciding whether, in light of the evidence, the agency has acted unreasonably, arbitrarily, illegally or in abuse of its discretion. . . . Furthermore, when a state agency's determination of a question of law has not previously been subject to judicial scrutiny . . . the agency is not entitled to special deference." (Citations omitted; internal quotation marks omitted.) *MacDermid, Inc.* v. *Dept. of Environmental Protection*, 257 Conn. 128, 136–37, 778 A.2d 7 (2001).

I

The plaintiffs claim that the defendant improperly construed § 22a-363b (a). Because that construction has not been subject to judicial scrutiny, we afford it no deference. The proper interpretation of § 22a-363b (a) presents a question of statutory construction over which our review is plenary. See *Fullerton* v. *Administrator, Unemployment Compensation Act*, 280 Conn. 745, 755, 911 A.2d 736 (2006).

"The principles that govern statutory construction are well established. When construing a statute, [o]ur fundamental objective is to ascertain and give effect to the apparent intent of the legislature. . . . In other words, we seek to determine, in a reasoned manner, the meaning of the statutory language as applied to the facts of [the] case, including the question of whether the language actually does apply. . . . In seeking to determine that meaning . . . [General Statutes] § 1-2z directs us first to consider the text of the statute itself and its relationship to other statutes. If, after examining such text and considering such relationship, the meaning of such text is plain and unambiguous and does not yield absurd or unworkable results, extra-textual evidence of the meaning of the statute shall not be considered. . . . The test to determine ambiguity is

whether the statute, when read in context, is susceptible to more than one reasonable interpretation." (Citation omitted; internal quotation marks omitted.) *Francis* v. *Fonfara*, 303 Conn. 292, 297, 33 A.3d 185 (2012). In addition, we are mindful that "exemptions to statutes are to be strictly construed." *Cannata* v. *Dept. of Environmental Protection*, 239 Conn. 124, 141, 680 A.2d 1329 (1996).

We thus begin our analysis with the text of the statute. Section 22a-363b is part of a statutory scheme governing the erection of structures in the water resources of the state. A permit generally is required prior to commencing any work therein.[4] See General Statutes §§ 22a-32 and 22a-361. Section 22a-363b (a) enumerates certain exceptions to that general rule. It provides in relevant part: "Routine maintenance of permitted structures, fill, obstructions or encroachments or routine maintenance of structures, fill, obstructions or encroachments in place prior to June 24, 1939, and continuously maintained and serviceable since that date shall be exempt from the requirements of obtaining certificates of permission or permits pursuant to section 22a-363a, this section or section 22a-361. The following activities may be eligible for a certificate of permission, in accordance with the provisions of subsections (c) and (d) of this section . . . (2) substantial maintenance of any structures, fill, obstructions or encroachments in place prior to June 24, 1939, and continuously maintained and serviceable since such time . . . ." By its plain language,

---

[4] General Statutes § 22a-361 (a) (1) provides: "No person, firm or corporation, public, municipal or private, shall dredge, erect any structure, place any fill, obstruction or encroachment or carry out any work incidental thereto or retain or maintain any structure, dredging or fill, in the tidal, coastal or navigable waters of the state waterward of the high tide line until such person, firm or corporation has submitted an application and has secured from the Commissioner of Environmental Protection a certificate or permit for such work and has agreed to carry out any conditions necessary to the implementation of such certificate or permit."

§ 22a-363b (a) distinguishes routine maintenance from substantial maintenance.[5] The statute expressly exempts routine maintenance of structures in place prior to June 24, 1939, from the requirements of obtaining either a certificate of permission *or* a permit.

By contrast, § 22a-363b (a) provides that substantial maintenance "may be eligible" for a certificate of permission, rather than a permit pursuant to § 22a-361, when, inter alia, the proposed activity is "substantial maintenance of any structures, fill, obstructions or encroachments in place prior to June 24, 1939, and continuously maintained and serviceable since such time . . . ."[6] Section 22a-363b (a) (2) thus sets forth two prerequisites to the granting of a certificate of permission to conduct substantial maintenance on such structures. First, the structure must have been in place prior to June 24, 1939. Second, the structure must have been "continuously maintained and serviceable" since

---

[5] General Statutes § 22a-363a defines routine maintenance as "replacement and repair of out-of-water structures including the surfaces of docks, piers, wharves and bridges, replacement or repair in any year of up to twenty-five per cent of all pilings approved in accordance with section 22a-361 and seasonal installation, reinstallation or repair of floating docks, provided that all locations, dimensions, elevations and materials shall remain the same as or equivalent to that approved in accordance with said section . . . ." Section 22a-363a defines substantial maintenance as "rebuilding, reconstructing, or reestablishing to a preexisting condition and dimension any structure, fill, obstruction or encroachment . . . ." To the extent that the plaintiffs in their appellate brief complain that the defendant failed to consider the import of "routine maintenance" in her ruling, that critique is misplaced, as their July 28, 2008 application for a certificate of permission expressly sought authorization to conduct "substantial maintenance" on their property. Similarly, the issue presented by the plaintiffs in their petition for a declaratory ruling was whether the department erred "in denying [their] application for a [certificate of permission] for substantial maintenance of structures that have existed on the property since prior to June 24, 1939."

[6] We note that § 22a-363b (a) (1) also pertains to substantial maintenance, providing in relevant part that "[s]ubstantial maintenance or repair of existing structures, fill, obstructions or encroachments authorized pursuant to section 22a-33 or section 22a-361" may be eligible for a certificate of permission. That statutory provision has no bearing on the present case.

that time. The phrase "continuously maintained and serviceable" is not defined by statute.

It is a cardinal rule of statutory construction that statutory words and phrases are to be given their ordinary meaning in accordance with the commonly approved usage of the language. See General Statutes § 1-1 (a) ("[i]n the construction of the statutes, words and phrases shall be construed according to the commonly approved usage of the language"). As our Supreme Court held almost one century ago, "[t]he words of a statute are to be interpreted in their natural and usual meaning unless the context indicates that a different meaning was intended. By our statute words and phrases are to be construed according to the commonly plain usage of language." *Brown* v. *New Haven Taxicab Co.*, 92 Conn. 252, 254, 102 A. 573 (1917); accord *State* v. *Grullon*, 212 Conn. 195, 200, 562 A2d 481 (1989) (words of statute to be given their ordinary meaning unless context dictates otherwise); *Caldor, Inc.* v. *Heffernan*, 183 Conn. 566, 570, 440 A.2d 767 (1981) (statutory term must be "interpreted in its natural and usual meaning unless the context indicates that a different one was intended"); *Gural* v. *Fazzino*, 45 Conn. App. 586, 588, 696 A.2d 1307 (1997) (in interpreting language of statute, words must be given plain and ordinary meaning and natural and usual sense).

"To ascertain the commonly approved usage of a word, we look to the dictionary definition of the term." (Internal quotation marks omitted.) *Stone-Krete Construction, Inc.* v. *Eder*, 280 Conn. 672, 678, 911 A.2d 300 (2006); see also *Hartford/Windsor Healthcare Properties, LLC* v. *Hartford*, 298 Conn. 191, 200–201, 3 A.3d 56 (2010) (appropriate to look to common understanding of term as expressed in dictionary if statute does not sufficiently define term). The defendant did precisely that in her declaratory ruling, noting that "the American Heritage Dictionary defines 'continuous' as

extending or prolonged without interruption or cessation, unbroken. 'Maintain' is defined as to continue, carry out, keep up or to keep in a condition of good repair or efficiency. 'Serviceable' is defined as ready for service, useable." The parties do not quarrel with those definitions,[7] and recourse to Webster's Third New International Dictionary (2002) confirms that they convey the common usage of the terms.[8] Those definitions indicate that the ordinary meaning of the phrase "continuously maintained and serviceable," as it is used in § 22a-363b (a) (2), requires that the structure must have been kept in a state of repair and fit for use without interruption, as the defendant determined in her declaratory ruling. That construction gives effect to the apparent intent of the legislature to permit substantial maintenance to the preexisting conditions and dimensions of pre-1939 structures in limited circumstances, while requiring a permit for modification or expansion thereof. It further comports with the mandate that "exemptions to statutes are to be strictly construed." *Cannata* v. *Dept. of Environmental Protection*, supra, 239 Conn. 141.

Because the aforementioned statutory language is not susceptible to more than one reasonable interpretation, it is not ambiguous. *Francis* v. *Fonfara*, supra, 303 Conn. 297. Accordingly, we conclude that the defendant properly construed § 22a-363b (a).

## II

The plaintiffs next contend that the court improperly concluded that substantial evidence supported the

[7] Indeed, the plaintiffs in their appellate brief set forth nearly identical definitions of those words. In particular, they define serviceable as "helpful, useful . . . fit for use."

[8] Webster's Third New International Dictionary (2002) defines continuous as "characterized by uninterrupted extension in space; stretching on without break . . . operated without interruption . . . ." It defines "maintain" as "to keep in a state of repair, efficiency, or validity; preserve from failure or decline" and defines serviceable as "fit for use; suited for a purpose; useable to advantage . . . ." Id.

defendant's determinations that their dock and board-walk were not eligible for a certificate of permission pursuant to § 22a-363b (a) (2). We disagree.

The plaintiffs' July 28, 2008 application for a certificate of permission expressly sought authorization to conduct "substantial maintenance" on their property. Their request was twofold in nature: they sought "to retain and maintain" the existing dock,[9] and they sought to remove the existing at-grade 4 foot by 100 foot wooden boardwalk and replace it with an elevated 4 foot by 152 foot wooden boardwalk. We deal with each aspect of the application in turn.

The request to conduct substantial maintenance on the wooden boardwalk requires little discussion. The defendant found that the boardwalk was not in place prior to June 24, 1939, as required by § 22a-363b (a) (2). The record substantiates that finding, as it is barren of any evidence indicating that a wooden boardwalk existed on the plaintiffs' property prior to that date. To the contrary, the court found that when Cole originally built the dock prior to 1939, he constructed a pathway of cinders or gravel through the tidal marsh leading to the dock.[10] General Statutes § 22a-363a plainly defines substantial maintenance as "rebuilding, reconstructing, or reestablishing *to a preexisting condition and dimension* any structure, fill, obstruction or encroachment . . . ."[11] (Emphasis added.) We agree with the defendant's determination that the installation of a wooden boardwalk in place of the pathway of cinders or gravel that existed prior to June 24, 1939, does not constitute

---

[9] Pursuant to § 22a-361 (a) (1), a permit generally is required before any person may "retain or maintain any structure . . . in the tidal, coastal or navigable waters of the state . . . ."

[10] The plaintiffs do not contest that factual finding in this appeal.

[11] The plaintiffs do not argue that the definition of substantial maintenance provided in § 22a-363a is ambiguous.

"reestablishing to a preexisting condition," as the stat-
ute requires. For those reasons, the defendant properly
concluded that the boardwalk was ineligible for a certif-
icate of permission pursuant to § 22a-363b (a) (2).

The plaintiff's request to conduct substantial mainte-
nance "to retain and maintain" the existing dock like-
wise suffers from multiple infirmities. Although a dock
existed on the property prior to June 24, 1939, the defen-
dant found that it had not been kept in a state of repair
and fit for use without interruption since that time. The
record contains ample evidence to support that finding.
The March, 1965 aerial photograph of the property and
the December 29, 2008 affidavit of DeAva Lambert, an
environmental analyst with the office who reviewed
that photograph, indicate that the pier in 1965 lacked
any decking and, hence, was not fit for use.[12] Likewise,
the July 23, 1981 aerial photograph indicates that much

[12] The record also contains a January 26, 2009 letter from Lambert to
the plaintiffs' counsel, in which Lambert details the manner in which she
examined the aerial photographs. That letter states in relevant part: "[U]nder-
standing these images requires more than simply looking at them with the
naked eye. For example, I use a magnifying loupe—similar to a magnifying
glass—to view details in a print or transparency of a photograph placed
on a light table. With magnification, a ruler can often help determine the
approximate measurements of visible structures. Also, the [department]
aerial photographs are colorized infrared to differentiate vegetative cover.
This helps to identify areas of tidal wetlands, intertidal features and wrack
lines. Other features, structures, or information may be discernable by linear
uniformity, elements of dimension, shadow, or contrasting light and dark
features. In short, distinguishing particular objects in aerial photographs
and understanding these photographs requires experience as well as thor-
ough and scrupulous observation, while making comparisons between pho-
tographs."

The plaintiffs, in their appellate brief, suggest that the defendant improp-
erly credited the analysis of Lambert over that of their expert, Lee Ross,
with respect to the aerial photographs in evidence. Such an assertion has
no place before this appellate tribunal, as courts in administrative appeals
"must defer to the agency's assessment of the credibility of the witnesses
and to the agency's right to believe or disbelieve the evidence presented by
any witness, even an expert, in whole or in part." *Briggs* v. *State Employees
Retirement Commission*, 210 Conn. 214, 217, 554 A.2d 292 (1989).

of the previously existing dock no longer was present on the property, supporting the defendant's finding that "[o]nly the first approximately 50 foot section of the pier, that begins on land, remains, in what appears to be a state of disrepair; there is no ramp, no section of floating dock and no 'T' float present." Indeed, a stark contrast between the dock as it existed on July 22, 1974, and July 23, 1981, plainly is visible in the aerial photographs taken on those dates.

It also is undisputed that the dock was destroyed by Hurricane Gloria in 1985 and "all that was left of the dock were pilings and some stringers," as the owner of the property at that time averred in his affidavit. Aerial photographs taken in March and July, 1986, confirm the absence of a dock at that time. As the defendant found in her declaratory ruling, "[t]he aerial photographs show that there were clearly periods of time that the dock was in such a state of disrepair that it could not be used. At other times, only a truncated dock, only a portion of what originally was present, could be used. Other portions of the original dock were no longer present. Other aerial photographs show that there was no dock at the site at all. . . . Even the [plaintiffs] acknowledge that for at least a three year period of time after Hurricane Gloria . . . there was no dock at the property." Those findings are substantiated by the aerial photographs in the record and the affidavit of Shiling indicating that he rebuilt the dock sometime in 1988, approximately three years after the hurricane had destroyed it.[13] Because the record contains substantial evidence to support the defendant's

[13] The plaintiffs also claim that the defendant improperly relied on certain records of the tax assessor of the town of Stonington, which demonstrated that the "docks and their corresponding assessments" were removed from the grand list in 1984 and later were "added back on to the 1990 assessment list." They rely on a January 12, 2009 letter from the Stonington assessor's office to the department, which stated in relevant part that although the assessor's office had no knowledge of the existence of a dock on the plaintiffs' property between 1984 and 1990, "[t]his does not mean that the docks

finding that the dock was not kept in a useable condition without interruption as § 22a-363b (a) (2) requires, the defendant properly determined that it is not eligible for a certificate of permission pursuant to that statute.

Moreover, the record contains substantial evidence underlying the defendant's findings that "the original dock [built prior to June 24, 1939, was] comprised of a pier with a timber crib located at the end of a 'T' shaped pier head. There were no stone-filled cribs, no ramps to a floating dock, and no floating dock elements of the kind [that now are present on the plaintiffs' property]." Indeed, the plaintiffs do not dispute that those modifications to the dock were undertaken well after June 24, 1939. Accordingly, a certificate of permission to "retain and maintain" the dock as so modified is impermissible, as the substantial maintenance permitted under § 22a-363b (a) (2) authorizes only the "rebuilding, reconstructing, or reestablishing to a preexisting condition and dimension" of structures in place prior to June 24, 1939.

III

The plaintiffs also claim that the court improperly denied their claim of equitable estoppel, which is predicated on the department's alleged failure to take "action to indicate that the repairs [made by Shiling in 1988] were not authorized." That claim is untenable.

"Under our well-established law, any claim of estoppel is predicated on proof of two essential elements: the party against whom estoppel is claimed must do or say something calculated or intended to induce another

were not there during this period of time . . . ." In light of that statement, the plaintiffs argue that the defendant should not have credited the evidence of the tax assessment records. We need not consider the merits of that contention, as the record contains substantial evidence apart from the tax records indicating that the dock was not kept in a useable condition in the years following its September, 1985 destruction.

party to believe that certain facts exist and to act on that belief; and the other party must change its position in reliance on those facts, thereby incurring some injury. . . . In addition, estoppel against a public agency is limited and may be invoked: (1) only with great caution; (2) only when the action in question has been induced by an agent having authority in such matters; and (3) only when special circumstances make it highly inequitable or oppressive not to estop the agency." (Citations omitted; internal quotation marks omitted.) *Kimberly-Clark Corp.* v. *Dubno,* 204 Conn. 137, 148, 527 A.2d 679 (1987).

The record before us is bereft of any evidence indicating that the department or its agents did or said anything calculated to induce the plaintiffs into changing their position as to the structures on their property. The plaintiffs have provided this court with no authority, nor are we aware of any, for their proposition that agency inaction may form the basis of an equitable estoppel claim. In addition, "[i]t is the burden of the person claiming the estoppel to show that he exercised due diligence to ascertain the truth and that he not only lacked knowledge of the true state of things but had no convenient means of acquiring that knowledge." (Internal quotation marks omitted.) Id. As the defendant noted in the declaratory ruling, the plaintiffs had a "readily available means for ascertaining whether the structures on the property had the required permits" at the time of their purchase in 2004, as they could have asked either the department or the sellers of the property.

In addition, the plaintiffs argue, as a general matter, that the department's action in enforcing the requirements of the General Statutes results "in extreme inequity for the plaintiffs . . . ." That claim is predicated on their allegation, set forth in the petition for a declaratory ruling, that the department did not issue permits for

the maintenance and repair of docks in the 1980s, but rather provided "verbal approvals" for such activity. That claim fails for two distinct reasons. First and foremost, the defendant found that the plaintiffs "failed to demonstrate that circa 1988 the department did not require or issue permits for the complete rebuilding of a pre-1939 dock or the installation of [a] wooden boardwalk as was done by [Shiling]." In reaching that determination, the defendant expressly credited the statements of Thompson indicating that the construction done by Shiling in 1988 would have required a permit under the department's then-existing policies.[14]

---

[14] In the declaratory ruling, the defendant stated in relevant part: "Thompson noted that with respect to pre-1939, that when the department's water resources division had responsibility for issuing permits under § 22a-361, that the department's understanding was that a permit was not necessary for the maintenance or upkeep of a dock *provided* the dock was in place before June 24, 1939, it had been continuously maintained and serviceable and that the activities restored or maintained the structure to its preexisting size, configuration, method of support and construction. [Thompson] noted that it was unclear whether this policy would apply to the complete rebuilding of a dock as was done by [Shiling]. He also noted that when responsibility for issuing such permits under § 22a-361 was transferred from the department's water resources division to the coastal area management divisions, sometime in the late 1980s, coincident with that transfer of responsibility, the department changed its interpretation of § 22a-361 and required a permit even for the upkeep or maintenance of pre-1939 structures. [Thompson] concluded that under either interpretation of § 22a-361, the dock built by [Shiling] would have required a permit. He also noted that the placement of a boardwalk on tidal wetlands would have also required a permit." (Emphasis in original.)

The plaintiffs contest that finding, relying heavily on the written statement of Arthur J. Rocque, Jr., former commissioner of the department. That statement indicated that "the records kept by the [department] [from the mid-1970s to 1990] concerning repairs or reconstruction of pre-1939 structures or previously permitted structures were extremely sparse" and that Rocque's "review of the policies and practices of [the department] revealed that the interpretation of the relevant statutes . . . was that permits were not required for either the repair or reconstruction of structures that had been issued prior permits, or for structures that existed prior to 1939 . . . ." The defendant, as arbiter of credibility, chose not to credit that evidence. Moreover, Rocque's statement can be reconciled with that of Thompson, in that Thompson explained that the department's understanding in the 1980s was that a permit was not necessary for the maintenance or upkeep

We will not disturb that credibility determination. *Briggs* v. *State Employees Retirement Commission*, 210 Conn. 214, 217, 554 A.2d 292 (1989) (court "must defer to the agency's assessment of the credibility of the witnesses and to the agency's right to believe or disbelieve the evidence presented by any witness, even an expert, in whole or in part"). In addition, even if the defendant had credited the plaintiffs' proposition that it was the department's practice in the 1980s to issue verbal approvals for the maintenance and repair of docks, it remains that the plaintiffs presented no evidence whatsoever indicating that previous owners of the property ever requested, never mind obtained, such approval. Indeed, Shiling's affidavit and handwritten notes indicate merely that he obtained "[a]ll building permits from the town of Stonington" and verbal approval from the United States Army Corps of Engineers. As the defendant found in the declaratory ruling, "there is no evidence that [Shiling] ever contacted the department to determine if a permit was required and frankly, no claim by the [plaintiffs] that any such contact was ever attempted." Accordingly, we conclude that the plaintiffs' equitable estoppel claim, including their ancillary contention regarding verbal approval, is meritless.

IV

The plaintiffs also claim that the court improperly concluded that the declaratory ruling did not violate their common law littoral rights. That issue presents a

of a dock provided the dock was in place before June 24, 1939, it had been continuously maintained and serviceable and the activities restored or maintained the structure to its preexisting size, configuration, method of support and construction. Because Rocque's statement does not specifically address pre-1939 structures whose size, configuration and construction were significantly modified in the years after 1939, a plausible reading of his statement is that it pertains to structures that underwent rebuilding and reconstruction consistent with the condition and dimensions that existed in 1939.

question of law over which our review is plenary. See *Murphy* v. *EAPWJP, LLC*, 123 Conn. App. 316, 329–30, 1 A.3d 1171, cert. granted on other grounds, 298 Conn. 930, 5 A.3d 489 (2010).

Littoral rights pertain to properties abutting an ocean, sea or lake. "[T]here is often confusion between the terms littoral and riparian as applied to the water rights of property owners. Littoral is the proper term for describing the rights that shoreline owners possess to make exclusive use of the land lying seaward of the mean high water mark. . . . [R]iparian rights are limited to rights related to the waters in a watercourse and include the right to take waters from a stream . . . ." (Internal quotation marks omitted.) *Caminis* v. *Troy*, 300 Conn. 297, 299 n.2, 12 A.3d 984 (2011). "The owner of the adjoining upland has certain exclusive *yet qualified* rights and privileges in the waters and submerged land adjoining his upland. He has the exclusive privilege of wharfing out and erecting piers over and upon such soil and for these purposes of occupying and using it in any manner which does not interfere with navigation . . . . [*State* v. *Knowles-Lombard Co.*, 122 Conn. 263, 265, 188 A. 275 (1936)]." (Emphasis added.) *Stefanoni* v. *Duncan*, 282 Conn. 686, 701, 923 A.2d 737 (2007).

At the same time, the rights of a littoral owner "are always subordinate to the public rights, and the state may regulate their exercise in the interest of the public. . . . [A] [littoral] proprietor . . . has the right of access to the navigable part of the [water] in front of his land, and to construct a wharf or pier projecting into the [water] . . . subject to such general rules and regulations as the legislature may prescribe for the protection of the public . . . . [I]t is clear that the rights of [littoral] landowners are ordinarily subject to regulation by [the] [s]tate. . . . [I]n the ordinary case, the [s]tate that grants [littoral] rights is also the [s]tate that

has regulatory authority over the exercise of those rights . . . ." (Citations omitted; internal quotation marks omitted.) *Murphy* v. *EAPWJP, LLC*, supra, 123 Conn. App. 331. As the Supreme Court noted more than one-half century ago, "[t]here is no reason why, because of its peculiar nature as property, [a littoral] right cannot, like any other property right, be made subject to reasonable police regulation in the interest of the public welfare." *Shorehaven Golf Club, Inc.* v. *Water Resources Commission*, 146 Conn. 619, 624, 153 A.2d 444 (1959).

The plaintiffs' position, as best we can understand, is that the denial of their application for a certificate of permission to conduct substantial maintenance on their property impermissibly infringed upon their littoral rights, despite the fact that they remained free to seek a permit for that activity. We disagree. The certificate of permission provided for by § 22a-363b (a) (2) is a creature of legislative grace, as it constitutes a narrow exception to the general permit requirements. As we already have discussed, the plaintiffs' dock and boardwalk plainly do not qualify for that exception. Accordingly, the plaintiffs, like most waterfront property owners, must comply with the permit requirements contained in our General Statutes. As an exercise of its regulatory authority, the state requires a permit to erect and maintain docks on waterfront properties. See General Statutes §§ 22a-32 and 22a-361. We concur with the assessment of our Supreme Court in *Bloom* v. *Water Resources Commission*, 157 Conn. 528, 536, 254 A.2d 884 (1969), that such a permit requirement is a reasonable exercise of the state's regulatory authority.

As the Superior Court observed, "[i]n denying the plaintiffs' application for a certificate of permission, the department has not ultimately denied the plaintiffs' right to reach deep water; nothing prevents the plaintiffs from seeking a permit to construct an acceptable and permittable structure." That critical distinction was

emphasized by the defendant in the declaratory ruling. She stated: "The department did not, and has never said, that the [plaintiffs] are unable to have a dock at their property. To the contrary, in meetings with [them], the department has offered to make itself available to discuss potential dock designs, locations, etc., at the [plaintiffs'] property. However, the current dock at [their] property does not have any authorization and the undisputed evidence is that this structure may well be causing environmental harm by eroding the shoreline. The dock may not even be wholly within the littoral area allocated to the [plaintiffs]. . . . I agree that this situation is unfortunate and it would have been better if this situation had been rectified earlier. However, the denial of a certificate of permission and the removal of unpermitted structures does not mean that the [plaintiffs] cannot have any structures on their property. It means that any structure that [they] would like to erect needs to be evaluated to ensure that it meets all applicable requirements and that all required permits are obtained. In fact, in a May 28, 2008 letter, the department strongly encouraged the [plaintiffs] to submit a permit application for the dock and boardwalk."

The plaintiffs also baldly assert that the denial of the certificate of permission results in the "taking of private property without just compensation." The plaintiff failed to brief that claim adequately. "Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . Where a claim receives only cursory attention in the brief without substantive discussion, it is deemed to be abandoned." (Internal quotation marks omitted.) *Billboards Divinity* v. *Commissioner of Transportation*, 133 Conn. App. 405, 412, 35 A.3d 395 (2012). Because the plaintiffs have not provided any substantive analysis, we do not review the merits of that assertion.

We conclude that the denial of the plaintiffs' application for a certificate of permission to conduct substantial maintenance on their property did not violate their littoral rights. Those rights are subject to reasonable regulation, which includes the permit requirements of §§ 22a-32 and 22a-361.

V

The plaintiffs next claim that the defendant improperly denied their second request for an extension of time. Although they allege a violation of their right to due process, it is well established that the procedural right involved in such administrative proceedings properly is described as a right to fundamental fairness. See *Grimes* v. *Conservation Commission*, 243 Conn. 266, 273 n.11, 703 A.2d 101 (1997); *Megin* v. *Zoning Board of Appeals*, 106 Conn. App. 602, 607 n.6, 942 A.2d 511, cert. denied, 289 Conn. 901, 957 A.2d 871 (2008). Following the plaintiffs' August 29, 2008 filing of their petition for a declaratory ruling, the defendant granted the department an extension of time until December 30, 2008, to submit a response thereto. The department complied. The plaintiffs then requested an extension of time to respond to the department's submission, which the defendant granted. The plaintiffs subsequently requested a second extension of time, which the defendant denied. On our review of the record, we conclude that the plaintiffs' right to fundamental fairness in the administrative proceeding was not violated by that denial.

VI

As a final matter, the plaintiffs argue that the declaratory ruling was "arbitrary, capricious and characterized by an abuse of discretion." Without citation to or discussion of any legal authority, they allege that the defendant's ruling "is fraught with inherent intellectual inconsistencies" and that "an objective observer would

conclude that the [defendant's] decision is character-
ized at nearly every turn as an abuse of discretion."
This appellate body disagrees. The findings underlying
the defendant's comprehensive ruling are supported
by substantial evidence in the record, and the legal
conclusions drawn therein reflect a correct and logical
application of the law to those findings. We therefore
reject the plaintiffs' contention that the defendant
abused her discretion in issuing the declaratory ruling.

The judgment is affirmed.

In this opinion the other judges concurred.