******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion. In no event will any such motions be accepted before the "officially released" date.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the electronic version of an opinion and the print version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest print version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears on the Commission on Official Legal Publications Electronic Bulletin Board Service and in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

THOMAS LANE ET AL. *v.* COMMISSIONER OF
ENVIRONMENTAL PROTECTION
(SC 19027)

Rogers, C. J., and Palmer, Zarella, Eveleigh, McDonald, Espinosa and
Vertefeuille, Js.

*Argued January 14—officially released October 7, 2014*

*Justin A. Torres*, pro hac vice, with whom was *Tracey Lane Russo*, for the appellants (plaintiffs).

*John M. Looney*, assistant attorney general, with whom, on the brief, was *George Jepsen*, attorney general, for the appellee (defendant).

*Opinion*

ESPINOSA, J. The issues that we must decide in this certified appeal are whether the defendant, the Commissioner of Environmental Protection, properly upheld rulings by the Department of Environmental Protection (department),[1] acting through its office of Long Island Sound Programs (office), requiring the plaintiffs, Thomas Lane and Gail Lane, to remove a boardwalk and dock from their property in Stonington because they had been built without the statutorily required permits, and finding that the plaintiffs were not entitled to a certificate of permission to construct a new boardwalk. The department, acting through the office, issued a notice of violation to the plaintiffs in 2007, ordering them to remove the boardwalk and dock from their property because they had been installed without the permits required by General Statutes § 22a-32[2] and General Statutes (Rev. to 2007) § 22a-361 (a).[3] Thereafter, the plaintiffs filed an application for a certificate of permission to retain and maintain the structures and to install a new boardwalk pursuant to General Statutes (Rev. to 2007) § 22a-363b (a) (2),[4] which the office denied. The plaintiffs then filed a petition for a declaratory ruling with the defendant, contending that the office improperly had issued the notice of violation and denied their application for a certificate of permission because the boardwalk and dock were eligible as structures that had been "in place prior to June 24, 1939, and continuously maintained and serviceable since such time . . . ." General Statutes (Rev. to 2007) § 22a-363b (a) (2). The defendant disagreed that the structures had been continuously maintained and serviceable under the proper meaning of that statutory phrase and upheld the office's rulings. The plaintiffs appealed from the defendant's ruling to the Superior Court, which dismissed the appeal. The plaintiffs then appealed to the Appellate Court, which affirmed the judgment of the trial court. *Lane* v. *Commissioner of Environmental Protection,* 136 Conn. App. 135, 161, 43 A.3d 821 (2012). This court granted the plaintiffs' petition for certification to appeal, limited to the following issue: "Did the Appellate Court properly interpret . . . § 22a-363b (a) in concluding that the trial court properly dismissed the plaintiffs' administrative appeal?" *Lane* v. *Commissioner of Environmental Protection,* 307 Conn. 906, 53 A.3d 221 (2012). We affirm the judgment of the Appellate Court.

The record reveals the following facts that were found by the defendant, or that are undisputed, and procedural history. The plaintiffs own property located at 32 Money Point Road in Stonington (property). A portion of the property is located on a tidal marsh that abuts Fishers Island Sound (sound). In 1937, Hugh Cole, who then owned the property, installed a cinder or gravel path through the tidal marsh to the water's edge

and built a dock extending from the end of the path approximately seventy-five feet into the sound. Aerial photographs of the property taken between 1951 and 2005 show that the dock varied in length and configuration over the years and, in some years, it was not visible at all.[5] In 1984, when the estate of Emma Cole was listed as the owner of the property, the Stonington tax assessor removed the dock from the list of taxable improvements on the property. In September, 1985, Hurricane Gloria struck the Connecticut coastline. An aerial photograph taken in March, 1986, showed that no dock structure was present on the property, and the path through the tidal marsh was "barely discernible as the tidal wetlands [had] mostly reestablished." A photograph taken in July, 1986, showed the same condition, but also showed that a ten feet by fifteen feet floating dock was located on the water next to the marsh.

In 1987, the property was transferred to David Shiling and Claire Warren, who installed a new boardwalk and a new dock. According to Shiling, the dock was installed " 'circa 1988,' " but he did not indicate precisely when the boardwalk was installed.[6] The Stonington tax assessor started assessing taxes on the new dock in 1990. In 2004, the property was transferred to the plaintiffs.

In March, 2007, office staff inspected the property.[7] In May, 2007, the office issued a notice of violation stating that, based on the inspection, "it appears that [the plaintiffs] have unauthorized structures comprised of a [2 feet by 82 feet] plywood walk laid out atop an estuarine marsh down to a [6 feet by 51 feet] pier with support pilings and two stone cribs, each [8 feet by 6 feet by 6 feet], out to a [2 1/2 feet by 10 feet] ramp with [a] railing and [an 8 feet by 20 feet] floating dock below the evidenced high tide line without authorizations required by . . . [§§] 22a-32 and 22a-361." The office directed the plaintiffs to "[p]lease correct the above referenced violation by removing by hand all structures to a location landward of the high tide line outside of tidal wetlands within forty-five . . . days."

In response to the notice of violation, the plaintiffs' attorney, Gregory A. Sharp, wrote a letter to the office in which he observed that the notice was apparently based on the 1986 aerial photograph that showed no dock structure on the property. Sharp claimed that the dock had been destroyed by Hurricane Gloria in 1985, and that, because of the unavailability of contractors due to the great amount of damage caused by the hurricane, Shiling had been unable to repair the dock until 1987. Brian Thompson, the director of the office, responded to Sharp's letter by pointing out that, although § 22a-363b "exempts routine maintenance of . . . structures that were continuously maintained and serviceable since June 24, 1939,"[8] the "substantial changes" in the dock facility on the plaintiffs' property

rendered it ineligible for the statutory exemption. Thompson reaffirmed the position of the office that the boardwalk and the dock must be removed, but indicated that if the plaintiffs "wish to pursue authorization for the placement of a dock facility that is consistent with [the department's] policies, [the office's] staff would be available to meet with them to discuss possible options." Thompson also stated, however, that, "[a]s the area of the [boardwalk] is high marsh, it is unlikely that a structure proposed over this area would be approvable."

Despite the office's stated position that the boardwalk and dock were not eligible for a certificate of permission pursuant to § 22a-363b, in July, 2008, the plaintiffs submitted an application for a certificate of permission pursuant to that statute in which they proposed to "[r]emove" a 4 feet by 100 feet at grade boardwalk and the landward 17 feet portion of a 5 feet by 74 feet fixed dock; to "[r]etain [and] maintain" an 8 feet by 16 feet floating dock, a 3 feet by 12 feet ramp, a 5 feet by 57 feet fixed dock with two 8 feet by 8 feet support cribs and pilings; and to "[c]onstruct" a 4 feet by 152 feet raised wooden boardwalk. The plaintiffs contended that the work was eligible for a certificate of permission because it constituted "[s]ubstantial maintenance of . . . structures . . . in place prior to June 24, 1939, and continuously maintained and serviceable since such time." The office denied the application for a certificate of permission on the ground that "the present structures are not equivalent to what had existed in prior years. Since there was no [boardwalk] and dock present in 1981 and 1986, the current structures have not been maintained and serviceable since June 24, 1939 . . . ."

The plaintiffs then filed a petition for a declaratory ruling with the defendant contending that the office's interpretation of § 22a-363b (a) (2) as requiring that structures remain virtually unchanged since June 24, 1939, to be eligible for a certificate of permission would frustrate the statute's "grandfathering" provision. In addition, the plaintiffs contended that the office should be estopped from acting on its directive requiring the plaintiffs to remove or to modify the existing structures because they had existed for twenty years and no enforcement action had been taken against any previous owner. They further argued that the office's "insistence on a written permit to establish the legality of the 1987 repairs is an impossible hurdle . . . because no such permits were issued in 1987."[9]

The defendant issued a declaratory ruling in which she concluded that the office had properly denied the plaintiffs' application for a certificate of permission and that it had properly issued the notice of violation. With respect to the application for a certificate of permission, the defendant found that there had been no wooden

boardwalk on the property until 1990. She also found that the plaintiffs' claims that the dock had been destroyed by Hurricane Gloria in 1985 and that Shiling had been unable to rebuild the dock because of a shortage of contractors were not supported by the evidence.[10] Rather, the evidence showed that there was no dock on the property in 1984, when the tax assessor removed the dock from the list of taxable improvements. Accordingly, the defendant concluded that the boardwalk and dock had not been continuously maintained and serviceable since June 24, 1939, as required by § 22a-363b (a) (2).

In reaching this conclusion, the defendant emphasized that "[t]his case has never turned on whether each nail, plank and timber from a pre-1939 structure has remained in place, unchanged over time. Nor does the department understand the term continuously maintained and serviceable to mean that a structure must remain unrepaired from June, 1939, to the present. Rather, the term continuously maintained and serviceable must be evaluated in the facts and circumstances of each case . . . ." The defendant noted that "the American Heritage Dictionary defines 'continuous' as extending or prolonged without interruption or cessation, unbroken. 'Maintain' is defined as to continue, carry out, keep up or to keep in a condition of good repair or efficiency. 'Serviceable' is defined as ready for service, usable. In the context of [§] 22a-363b (a) (2) these terms mean that to be eligible for a [certificate of permission], the structure in question must have not only been in place before June 24, 1939, it must have been in good repair and usable, without interruption, from June, 1939, until the time a [certificate of permission] is sought."

With respect to the plaintiffs' claim that the office was estopped from issuing the notice of violation because, when Shiling performed the work in 1988, the department had not required permits for the repair or rebuilding of structures that had been in place prior to June 24, 1939, the defendant observed that there was conflicting evidence regarding the department's permitting policy during that period. Although the defendant's predecessor, Arthur J. Rocque, Jr., had submitted a statement that supported the plaintiffs' position that a permit was not required for the reconstruction of docks or boardwalks that had existed prior to 1939, Thompson had submitted an affidavit in which he stated that, up to the late 1980's, the department's interpretation of the then applicable version of § 22a-361[11] was that "a permit was not necessary for the maintenance or upkeep of a dock *provided* the dock was in place before June 24, 1939, it had been continuously maintained and serviceable and that the activities restored or maintained the structure to its preexisting size, configuration, method of support and construction."[12] (Emphasis in original.) Thompson also stated that, at some point in the late

1980's, "the department changed its interpretation of [§] 22a-361 and required a permit even for the upkeep or maintenance of pre-1939 structures." The defendant ultimately concluded that the plaintiffs had "failed to demonstrate that circa 1988 the department did not require or issue permits for the complete rebuilding of a pre-1939 dock or the installation of a wooden boardwalk as was done by . . . [Shiling]."[13]

The defendant also concluded that, "regardless of the department's *policy*, the law, circa 1988, was clear; a permit was definitely required . . . under [General Statutes (Rev. to 1987) §] 22a-361 for the erection of structures, including the building of a dock and boardwalk waterward of the high tide line, and . . . under [§] 22a-32 for engaging in regulated activity in a wetland, namely, the placement of a boardwalk upon a tidal marsh. The law made no exceptions for the complete rebuilding of structures that may have existed in some form in 1939."[14] (Emphasis in original; footnote omitted.) Accordingly, the defendant concluded that the office had properly issued the notice of violation.

The plaintiffs appealed from the defendant's declaratory ruling to the Superior Court, which affirmed the ruling and dismissed the appeal. The plaintiffs then appealed to the Appellate Court claiming, inter alia, that the defendant had misconstrued the phrase "continuously maintained and serviceable" as used in § 22a-363b (a) (2) when it upheld the denial of their application for a certificate of permission; *Lane* v. *Commissioner of Environmental Protection*, supra, 136 Conn. App. 145; and that the defendant improperly had concluded that the office was not estopped from issuing the notice of violation because the department had not brought an enforcement action for twenty years and had not required permits for the rebuilding of preexisting docks in 1988. Id., 153–56. The Appellate Court concluded that "the ordinary meaning of the phrase 'continuously maintained and serviceable,' as it is used in § 22a-363b (a) (2), requires that the structure must have been kept in a state of repair and fit for use without interruption, as the defendant determined in her declaratory ruling." Id., 149. The Appellate Court also rejected the plaintiffs' estoppel claim. Id., 156. After rejecting the plaintiffs' other claims on appeal, the Appellate Court affirmed the judgment of the trial court dismissing the plaintiffs' appeal. Id., 161.

This certified appeal followed. In their appeal to this court, the plaintiffs have modified the position that they advanced in the underlying proceedings, abandoning any claim predicated on the notion that the existing dock and boardwalk had been continuously maintained and serviceable since prior to 1939. With respect to the notice of violation for those existing structures, the plaintiffs now claim that the defendant, the trial court and the Appellate Court improperly applied the provi-

sions of § 22a-363b (a) (2) retroactively to the construction of the boardwalk and dock in 1988, in upholding the validity of the office's notice of violation.[15] Specifically, they claim that, because § 22a-363b was enacted in 1990; see Public Acts 1990, No. 90-111, § 2; the requirement of § 22a-363b (a) (2) that, in order to repair and maintain a structure without obtaining a permit pursuant to § 22a-361, the structure must have been "in place prior to June 24, 1939, and continuously maintained and serviceable since such time," does not apply to their dock because it was built in 1988.[16] The plaintiffs further contend that, under the law that was in effect in 1988, Shiling was not required to obtain permits to perform the work on the dock because a temporary cessation in the use of the structures does not constitute a discontinuance of the use when there was no intent by the owner of the property to abandon the use. Finally, with respect to their application for a certificate of permission for the installation of the new boardwalk, the plaintiffs claim that the Appellate Court improperly interpreted § 22a-363b (a) (2) when it affirmed the defendant's ruling upholding the office's denial of the application because: (1) the cinder or gravel path has been continuously maintained and serviceable since June 24, 1939; and (2) according to the plaintiffs, the new boardwalk will be less harmful to the environment than the path.

We first address the plaintiffs' claim that the defendant, the trial court and the Appellate Court improperly applied the provisions of § 22a-363b (a) (2) retroactively in upholding the office's issuance of the notice of violation. Because the question of whether § 22a-363b applies retroactively has not been the subject of a time-tested interpretation by the department and has not previously been subject to judicial scrutiny, our review is plenary. See *Longley* v. *State Employees Retirement Commission*, 284 Conn. 149, 166, 931 A.2d 890 (2007) ("plenary review should be applied [when] the issue of law [has] not been time-tested by the [agency] or previously considered by the courts" [internal quotation marks omitted]); see also *Mead* v. *Commissioner of Correction*, 282 Conn. 317, 322–23, 920 A.2d 301 (2007) ("[w]hether a legislative act applies retroactively is a question of law over which this court has plenary review").

We agree with the plaintiffs that it is implicit in the foregoing procedural history that both the office and the defendant had assumed for purposes of their rulings that § 22a-363b (a) (2) applied retroactively and, therefore, if the plaintiffs could establish that the boardwalk and dock that Shiling had built in 1988 had been "in place prior to June 24, 1939, and continuously maintained and serviceable since such time," they would be entitled to a certificate of permission for the structures.[17] In addition, in upholding the defendant's ruling, both the trial court and the Appellate Court appear to

have assumed that that was the case. We also agree with the plaintiffs that the assumption that § 22a-363b (a) (2) could be applied retroactively to Shiling's activities in 1988 was incorrect. Pursuant to General Statutes § 55-3, "[n]o provision of the general statutes, not previously contained in the statutes of the state, which imposes any new obligation on any person or corporation, shall be construed to have retrospective effect." Section 55-3 sets forth "a rule of presumed legislative intent that statutes affecting substantive rights shall apply prospectively only." (Internal quotation marks omitted.) *Walsh* v. *Jodoin*, 283 Conn. 187, 195, 925 A.2d 1086 (2007); see also *Reid* v. *Zoning Board of Appeals*, 235 Conn. 850, 859 n.6, 670 A.2d 1271 (1996) ("[i]t is a rule of construction that legislation is to be applied prospectively unless the legislature clearly expresses an intention to the contrary" [internal quotation marks omitted]). Because § 22a-363b (a) (2) affected the substantive rights of persons who seek to repair and maintain a structure that has been "in place prior to June 24, 1939, and continuously maintained and serviceable since such time," and because the legislature did not clearly express an intent that the statute was to be applied retroactively, we conclude that the provision has no retroactive effect.

In upholding the *notice of violation*, however, the defendant did not rely on a retroactive application of § 22a-363b (a) (2). Indeed, as we have indicated, she expressly concluded that that statute *did not apply* to Shiling's activities in 1988 because the plaintiffs had not established that the boardwalk and dock had been continuously maintained and serviceable since June 24, 1939. In other words, the defendant reached the right conclusion—that § 22a-363b (a) (2) was inapplicable to Shiling's activities in 1988—for the wrong reason. Having concluded that § 22a-363b (a) (2) did not apply, the defendant applied the revision of § 22a-361 that was in effect when Shiling installed the boardwalk and dock in 1988 and concluded that, *under that statute*, a permit was required for "the complete rebuilding of structures that may have existed in some form in 1939."[18] Similarly, the trial court and the Appellate Court did not rely on § 22a-363b to uphold the defendant's ruling on the notice of violation, but concluded that the defendant had properly determined that § 22a-363b *did not apply* to Shiling's activities in 1988 because the boardwalk and dock did not meet the statutory criteria for a certificate of permission.[19] See *Lane* v. *Commissioner of Environmental Protection*, supra, 136 Conn. App. 145–49. Accordingly, we reject the plaintiffs' claim that the defendant, the trial court and the Appellate Court upheld the notice of violation based on an improper retroactive application of § 22a-363b (a) (2).

We also reject the plaintiffs' claim that, under the revision of § 22a-361 that was in effect in 1988, Shiling was not required to obtain a permit to construct a dock

on the property. Specifically, the plaintiffs contend that no permit was required to rebuild a structure that had existed on June 24, 1939, and that had temporarily ceased to exist, when the owner had no intent to abandon the use of the structure.[20] Thus, the question raised by the plaintiffs is whether, under the revision of § 22a-361 that was in effect in 1988, the provision requiring a permit to "erect any structure . . . in the tidal, coastal or navigable waters of the state" required an owner to obtain a permit for the "complete rebuilding" of a structure that had been in place on June 24, 1939, even if the structure was destroyed through no fault of the owner and the owner had no intent to abandon the use of the structure. With respect to the meaning of this particular language as it applies to the question in this appeal, the provision has not been the subject of a time-tested interpretation by the department and previously has not been subject to judicial scrutiny. But see *Shanahan* v. *Dept. of Environmental Protection*, 305 Conn. 681, 718, 47 A.3d 364 (2012) (interpreting phrase "work incidental thereto" in § 22a-361 [a]). Accordingly, our review of that question is plenary. See *Longley* v. *State Employees Retirement Commission*, supra, 284 Conn. 166.

The defendant concedes that the predecessor to § 22a-361 that was enacted in 1939; see footnote 8 of this opinion; "did not affect" existing structures that were in place on the effective date of that act, namely, June 24, 1939, and that successor statutes, such as the revision that was in effect in 1988, also do not require permits for any such structures that have been continuously in place since that date. In other words, the defendant concedes that then existing structures were exempt from the permitting requirements. The defendant contends, however, that the predecessor to § 22a-361 "did not exempt *new* structures that were built to *replace* existing structures. It did not grandfather the replacement of old structures destroyed by time or weather with new structures. It did not create a statutory exception for subsequent property owners to construct any type of encroachment they desired without first obtaining a permit. If a *new* structure was to be constructed for any purpose, state permission was necessary." (Emphasis added.)

We agree with the defendant's interpretation of the revision of § 22a-361 that was in effect in 1988. The plain language of the statute provides that "[n]o person . . . shall erect any structure . . . in the tidal, coastal or navigable waters of the state until such person . . . has secured from said commissioner a certificate or permit for such work . . . ." General Statutes (Rev. to 1987) § 22a-361. If a structure that existed on June 24, 1939, has been entirely destroyed by time or rough weather, the structure can be replaced only by *erecting a new structure*. Nothing in the statute suggests that a person may erect *any* structure in the tidal, coastal or

navigable waters of the state without obtaining a permit.[21]

The plaintiffs contend, however, that this interpretation is incorrect because the principles that govern nonconforming uses in land use cases also apply to structures that preexisted the 1939 act. They contend that, under these principles, the revision of § 22a-361 that was in effect in 1988 should not be construed to require a permit to rebuild a structure that existed as of June 24, 1939, and the structure thereafter temporarily ceased to exist but the owner did not intend to relinquish use of the structure. See *Cummings* v. *Tripp*, 204 Conn. 67, 93, 527 A.2d 230 (1987) ("[t]o establish abandonment, the intention on the part of the owner [must be] to relinquish *permanently* the nonconforming use" [emphasis in original; internal quotation marks omitted]); *Magnano* v. *Zoning Board of Appeals*, 188 Conn. 225, 228, 449 A.2d 148 (1982) ("[a] use . . . is not discontinued . . . by a mere temporary suspension for a reasonable time, for reasons beyond the owner's control, where there exists a manifested intention on the part of the owner to resume the nonconforming use" [internal quotation marks omitted]); *Point O'Woods Assn., Inc.* v. *Zoning Board of Appeals*, 178 Conn. 364, 369, 423 A.2d 90 (1979) ("[t]he temporary interruption or suspension of a nonconforming use without substitution of a conforming one or such a definite and substantial departure from previously existing conditions and uses as to signify an abandonment of the latter, does not terminate the right to resume them" [internal quotation marks omitted]).

We conclude that these principles governing nonconforming uses in the land use context do not apply to structures of a type that are subject to the revision of § 22a-361 that was in effect in 1988. First, as a general matter, we are not permitted to use common-law principles to vary or supplement the otherwise plain meaning of a statute. General Statutes § 1-2z. Second, in the land use context, the resumption of a nonconforming use that has been temporarily abandoned merely restores the land to its preexisting condition. In contrast, when a structure of a type that is subject to § 22a-361 has been entirely destroyed, erecting a replacement structure—as distinct from resuming the use of a continuously existing structure—could well have a substantial harmful effect on the "indigenous aquatic life, fish and wildlife . . . shore erosion and coastal flooding, the use and development of adjoining uplands, the improvement of coastal and inland navigation for all vessels . . . the use and development of adjacent lands and properties and the interests of the state, including pollution control, water quality, recreational use of public water and . . . coastal resources"; General Statutes § 22a-359 (a); which harmful effects § 22a-361 was intended to prevent. In other words, unlike the resumption of a nonconforming use in the land use context,

the erection of a new structure to replace a destroyed structure of a type that is subject to § 22a-361 could well have harmful effects on the environment that the destroyed structure itself would not have had if it had continued to exist. Indeed, in the present case, the defendant expressly found that the dock installed by Shiling "is causing environmental degradation" of at least one of the resources enumerated in § 22a-359, a finding that is supported by the evidence and that the plaintiffs do not dispute.[22] Accordingly, it is reasonable to conclude that, before the enactment of § 22a-363b in 1990, the legislature intended to require owners to obtain a permit for the construction of a new structure to replace a destroyed structure of a type that is subject to § 22a-361, even if the owner had no intent to relinquish the use of the structure when it was destroyed.[23]

Finally, we address the plaintiffs' claim that the Appellate Court improperly affirmed the defendant's ruling upholding the office's denial of the plaintiffs' application for a certificate of permission pursuant to § 22a-363b (a) (2). As we have explained, the plaintiffs now recognize that, contrary to the claim that they made in their application for a certificate of permission, in their petition for a declaratory ruling and in their briefs to the trial court and the Appellate Court, § 22a-363b (a) (2) cannot be applied retroactively to authorize a certificate of permission for Shiling's work in 1988. See footnote 15 of this opinion. They claim, however, that, because a cinder or gravel path over the tidal marsh has been "in place prior to June 24, 1939, and continuously maintained and serviceable since [that] time"; General Statutes (Rev. to 2007) § 22a-363b (a) (2); and because, according to them, the new boardwalk that they propose to install will be less harmful to the environment than the cinder or gravel path, they are entitled to a certificate of permission to install the new boardwalk.

The following facts and procedural history are relevant to this claim. As we have indicated, the plaintiffs sought permission, in their application for a certificate of permission, to remove a 4 feet by 100 feet at grade boardwalk and 17 feet of the landward portion of the dock and to replace this structure with a 4 feet by 152 feet raised boardwalk. The information that the plaintiffs submitted with their application indicated that the path originally installed in 1937 had been made of cinders or gravel. There was no evidence of any type of structure on the path until 1990, when a boardwalk appeared in an aerial photograph.

As we also have indicated, the office denied the plaintiffs' application for a certificate of permission. In upholding the office's denial with respect to the proposed boardwalk, the defendant concluded both that a wooden boardwalk "has not been continuously maintained and serviceable at the . . . property since June

24, 1939" and that the proposed boardwalk "does not qualify as 'substantial maintenance' since the construction of a [4 feet by 152 feet] raised boardwalk . . . goes well beyond merely rebuilding, reconstructing or reestablishing what was formerly a cinder or gravel path, with no raised boardwalk upon it, to its preexisting condition." The trial court and the Appellate Court agreed with both of these conclusions. See *Lane* v. *Commissioner of Environmental Protection*, supra, 136 Conn. App. 150–51.

The plaintiffs do not dispute any of the underlying facts found by the defendant, but contend only that the defendant improperly construed the "continuously maintained and serviceable" language of § 22a-363b (a) (2) in upholding the office's denial of a certificate of permission to build the proposed boardwalk. Because this language has not been the subject of a time-tested interpretation by the department or previously subject to judicial scrutiny, our review is plenary. See *Longley* v. *State Employees Retirement Commission*, supra, 284 Conn. 166.

We conclude that the defendant, the trial court and the Appellate Court properly construed and applied § 22a-363b (a) (2). General Statutes (Rev. to 2007) § 22a-363b (a) provides that "[t]he following activities may be eligible for a certificate of permission . . . (2) substantial maintenance of any structures, fill, obstructions or encroachments in place prior to June 24, 1939, and continuously maintained and serviceable since such time . . . ." General Statutes (Supp. 2014) § 22a-363a[24] defines " '[s]ubstantial maintenance' " to mean "rebuilding, reconstructing, or reestablishing to a preexisting condition and dimension any structure . . . ." Thus, under the plain language of § 22a-363a, an owner is entitled to a certificate of permission pursuant to § 22a-363b (a) (2) only if the proposed activity will reestablish the preexisting condition. In turn, it is clear that a proposed structure that does not reestablish the preexisting condition is not one that has been "continuously maintained and serviceable" since June 24, 1939, for purposes of § 22a-363b (a) (2). The plaintiffs make no claim that the proposed boardwalk will reestablish the preexisting condition of the path. Indeed, they do not refer at all to § 22a-363a in their main brief to this court.[25] Accordingly, we reject this claim.[26]

The judgment of the Appellate Court is affirmed.

In this opinion ROGERS, C. J., and PALMER, EVELEIGH, ESPINOSA and VERTEFEUILLE, Js., concurred.

[1] In July, 2011, subsequent to the underlying events in the present case, the department merged into a new agency, the Department of Energy and Environmental Protection. See Public Acts 2011, No. 11-80, §§ 1, 55.

[2] General Statutes § 22a-32 provides in relevant part: "No regulated activity shall be conducted upon any wetland without a permit. . . ."

[3] General Statutes (Rev. to 2007) § 22a-361 provides in relevant part: "(a) No person . . . shall . . . erect any structure . . . or retain or maintain

any structure . . . in the tidal, coastal or navigable waters of the state waterward of the high tide line until such person . . . has submitted an application and has secured . . . a certificate or permit for such work . . . ."

Although the office did not specify which revision of the General Statutes required the plaintiffs to obtain permits for the boardwalk and dock, we assume that the office relied on the revision that was in effect when it issued the notice of violation. As we discuss more fully later in this opinion, the defendant ultimately concluded that the plaintiffs were required to obtain the required permits for retaining and maintaining the structures under the revision of § 22a-361 that was in effect when the boardwalk and dock were installed in 1988. See footnote 11 of this opinion. All references in this opinion to § 22a-361 are to the 2007 revision unless otherwise indicated.

[4] General Statutes (Rev. to 2007) § 22a-363b (a) provides in relevant part: "The following activities may be eligible for a certificate of permission, in accordance with the provisions of subsections (c) and (d) of this section . . . (2) substantial maintenance of any structures, fill, obstructions or encroachments in place prior to June 24, 1939, and continuously maintained and serviceable since such time . . . ."

All references hereinafter are to the 2007 revision of the statute unless otherwise indicated. We note that in 2013 the legislature amended § 22a-363b (a) (2) and replaced references to June 24, 1939, with references to January 1, 1995. Public Acts 2013, No. 13-179, § 10.

[5] As set forth in the opinion of the Appellate Court, the defendant made the following findings: "A 1951 aerial photograph shows an approximately 100 [feet] long pier with a timber crib located at the end of a T shaped pier head. There is a graded path through the marsh to the pier. A 1965 aerial photograph shows the pier in a state of disrepair without any decking. A graded path is still visible through the high marsh vegetation. A 1968 and a 1970 aerial photograph shows a pier less than 40 feet long with a cleared or graded path through the tidal marsh. A July, 1974 aerial photograph shows the graded path through the tidal marsh and a new pier/floating dock in place. The first pier section, beginning on land, is less than 50 feet long. This pier leads to a ramp, approximately 10 feet long, that leads to a floating section of dock, approximately 65 feet long, connected to a 20 [feet] by 10 [feet] T float. A July, 1981 aerial photograph shows a thinner path through the marsh with encroaching vegetation. Only the first approximately 50 [feet] section of the pier, that begins on land, remains, in what appears to be a state of disrepair; there is no ramp, no section of floating dock and no T float present. In a March, 1986 aerial photograph no pier, ramp, float or other dock structure is present. Also, the path through the tidal marsh is barely discernable as the tidal wetlands have mostly reestablished. A July, 1986 aerial photograph shows the same condition, except a 10 [feet] by 15 [feet] floating dock is situated on the waterward edge of the marsh. A July, 1990 aerial photograph shows an approximately 120 [feet] by 3 [feet] at grade wooden boardwalk placed directly on the tidal marsh. This is the first time that a wooden boardwalk appears on the marsh. The boardwalk leads to a 6 [feet] wide pier that begins on land and extends into the near shore waters. The pier is estimated to be 78 feet long. The pier is supported by two stone-filled cribs, approximately 8 feet by 8 feet, located at the middle and at the end of the pier. Following the pier is a ramp longer than 10 feet that leads to a floating dock that is approximately 20 feet by 10 feet in size. In a 1995 aerial photograph, a portion of the at grade walkway is missing, reducing the boardwalk to about 100 linear feet. The pier is in a state of disrepair as exposed stringers are visible. The ramp and float are still in place. In a September, 2000 aerial photograph the pier is more dilapidated than in 1995, however replacement sections of the boardwalk are visible. In a March, 2004 aerial photograph, the entire boardwalk is gone and a pier, ramp and float, consistent with the 1990 aerial photograph, are in place. A September, 2005 aerial photograph shows the pier repaired and only 80 feet of the boardwalk [are] present." (Footnote omitted; internal quotation marks omitted.) *Lane* v. *Commissioner of Environmental Protection*, supra, 136 Conn. App. 139–40.

[6] In their brief to this court, the plaintiffs repeatedly suggest that Shiling installed the boardwalk and dock in 1987. The defendant found, however, that Shiling installed the dock " 'circa 1988,' " and the plaintiffs have not explained why we should disregard this finding. The defendant found that the boardwalk first appeared in aerial photographs in 1990. Because it makes no difference to our analysis whether the boardwalk was installed in 1988, 1989, or 1990, for ease of reference, we assume for purposes of this opinion

that the boardwalk was installed in 1988.

[7] The defendant found that the office inspected the property in March, 2007. Correspondence from the plaintiffs' attorney to the office indicates, however, that the inspection took place in March, 2006, after the plaintiffs sought permission from the office to eliminate the plywood boardwalk and to replace it with a raised boardwalk.

[8] The original predecessor to § 22a-361 was enacted on June 24, 1939. See 23 Spec. Acts 635, No. 568, § 6 (1939) ("[n]o person . . . shall undertake the use of any of the navigable waters located within or partially within the state, or place any obstruction or encroachment in such waters until such person . . . shall have first secured from this commission a certificate to the effect that such use, or the construction of such obstruction or encroachment, will have no adverse effect upon the navigability of any stream or watercourse within this state, or on any right of the state, and that such use or obstruction or encroachment will not increase the hazard of damage to life or property by reason of flood waters"). The defendant concedes that this legislation did not require a certificate for existing structures that were constructed prior to the enactment of the special act.

[9] In support of this claim, the plaintiffs pointed out that Gail Lane had recently submitted a request under the Freedom of Information Act, General Statutes § 1-200 et seq., for permits for the rebuilding of existing structures, and contended that a review of the 151 permit applications issued between 1985 and 1989 showed that none of them was for the reconstruction of an existing residential dock.

[10] The evidence that the plaintiffs submitted in support of their claim that the dock had been destroyed by Hurricane Gloria included a letter from Hugh Cole, the son of Hugh Cole who had purchased the property in 1937. Cole's letter stated that, "[w]hen I inherited the property in 1985, the dock needed repairs. After Hurricane Gloria . . . all that was left of the dock were pilings and some stringers. The tread way was all but gone due to the [h]urricane." The plaintiffs also submitted a letter from Shiling in which he stated: "We owned the house at 32 Money Point Road . . . at the time the dock that is currently in was built ([c]irca 1988). We contracted with Randy Conraty of Avondale Boat Yard in Rhode Island to build the dock. All necessary permits were in place for the dock prior to construction. My recollection is that permission to rebuild the dock to its former length out over the water as per a flyover done of that area of the shoreline was undertaken and did not go beyond what was allowed. All building permits from the [t]own of Stonington were obtained."

[11] General Statutes (Rev. to 1987) § 22a-361 provides in relevant part: "No person, firm or corporation, public, municipal or private, shall erect any structure, place any fill, obstruction or encroachment or carry out any dredging or other work incidental thereto in the tidal, coastal or navigable waters of the state until such person, firm or corporation has submitted an application and has secured from said commissioner a certificate or permit for such work and has agreed to carry out any conditions necessary to the implementation of such certificate or permit. . . ." General Statutes (Rev. to 1987) § 22a-361 was amended by Public Acts 1987, No. 87-495, § 4, for purposes not relevant to this appeal.

[12] Thompson's affidavit included the following statements: "(a) [T]here is no support for the conclusion in [Thomas] Lane's affidavit that it was the department's policy . . . 'to provide verbal permission to repair a damaged dock to any person who had an existing permit.' No documentation regarding the alleged practice could be found and I know of no one in the department who can say with any degree of certainty whether the department did or did not provide verbal authorizations for the repair of docks damaged by Hurricane Gloria.

"(b) [A]t some point before the enactment of [General Statutes] §§ 22a-363a to 22a-363d, inclusive, when the department's Water Resources Division had responsibility for issuing permits under . . . § 22a-361, the department apparently interpreted [§] 22a-361 so that a permit for the maintenance or upkeep of a dock or pier that was in place prior to June 24, 1939, and which was continuously maintained and serviceable since such time was not required. While the precise contours of this interpretation are not clear, and no written documentation regarding this interpretation, or the basis for this interpretation, could be found, the interpretation apparently covered maintenance activities, provided those activities restored or maintained the size, configuration, method of support and construction, etc., for the dock or pier as it existed prior to June 24, 1939. It is unclear, however, whether this interpretation would have applied to the complete rebuild of a dock

and pier damaged or destroyed by a hurricane.

"(c) [T]he department changed this interpretation and began requiring a permit even for the maintenance of or upkeep of docks or piers in place prior to June 24, 1939. Precisely when this interpretation changed is not clear, although it apparently coincided with the shift in responsibility for issuing permits under . . . § 22a-361 from the department's Water Resources Division to the Coastal Area Management Division of the department. Again, no written documentation regarding this change in approach could be found. This change in approach ultimately culminated in the enactment of . . . [§§] 22a-363a to 22a-363d, inclusive, in which the General Assembly made clear what types of maintenance required or did not require an authorization or certificate of permission, and which preexisting structures, including residential docks or piers, that had been constructed without a permit could receive an authorization or certificate of permission after the fact." (Footnote omitted.)

[13] In support of this conclusion, the defendant found that "some of the permit files produced in response to [Gail] Lane's [Freedom of Information Act request] did in fact involve the reconstruction or repair of residential docks," and that there was no evidence that the department treated docks that had been in existence as of June 24, 1939, differently than other docks. The defendant also found that there was no way of knowing whether any of the permits issued by the department after Hurricane Gloria were for the repair of storm damage.

[14] The defendant also stated that, "[r]egardless of whether the department did or did not require or issue permits at the time that [Shiling] constructed a dock and boardwalk, it is clear that a permit is required now. Section 22a-361 requires a permit not only for erecting a structure, but also for retaining or maintaining a structure waterward of the high tide line." See footnote 3 of this opinion for the text of § 22a-361.

[15] The plaintiffs state in their brief to this court that "the decision of the Appellate Court to uphold the [defendant's] rejection of the [plaintiffs'] application for a [c]ertificate of [p]ermission *for the proposed new construction* (*as distinct from the 1987 repairs*) was legal error." (Emphasis added.) It is clear, therefore, that, on the basis of their recently acquired insight that § 22a-363b (a) (2) is not retroactive, the plaintiffs are now claiming that they are entitled to a certificate of permission *only* for the proposed new boardwalk, and they have abandoned the claim that they made to the office, to the defendant, to the trial court and to the Appellate Court that they are entitled to a certificate of permission for the boardwalk and dock that Shiling built in 1988 pursuant to that statute. With respect to those existing structures, they now claim only that § 22a-363b (a) (2) *cannot* provide the basis for a notice of violation.

[16] The defendant contends that this issue is not encompassed by the certified question, which is whether the Appellate Court properly construed § 22a-363b (a) (2). We disagree. The proper construction of § 22a-363b (a) (2) includes the question of whether the statute applies to the plaintiffs' conduct. See *Thomas* v. *Dept. of Developmental Services*, 297 Conn. 391, 399, 999 A.2d 682 (2010) ("[t]he process of statutory interpretation involves the determination of the meaning of the statutory language as applied to the facts of the case, including the question of whether the language does so apply" [internal quotation marks omitted]). Moreover, although it does not appear that the plaintiffs raised the issue of the retroactivity of § 22a-363b (a) (2) in any of the proceedings before the defendant, the trial court or the Appellate Court (aside from a passing allegation in their complaint that the department's "application of the current view retroactively to residential homeowners is arbitrary, capricious, and characterized by abuse of discretion and/or unwarranted exercise of discretion"), this court may review an unpreserved claim if the party raising the claim cannot prevail. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 157–58, 84 A.3d 840 (2014) ("[r]eview of an unpreserved claim may be appropriate . . . when the minimal requirements for review are met and . . . the party who raised the unpreserved claim cannot prevail" [citation omitted; emphasis omitted; footnote omitted]).

[17] The plaintiffs also made that assumption. Indeed, it was the plaintiffs who first injected § 22a-363b (a) (2) into this case when they filed their application for a certificate of permission for the work performed by Shiling in 1988.

[18] As we have indicated, the defendant also concluded that, under the then current revision of § 22a-361 (a), which is identical to the current version in all relevant respects, a permit is required because that statute

"requires a permit not only for erecting a structure, but also for retaining or maintaining a structure waterward" of the high tide line. See General Statutes (Supp. 2014) § 22a-361 (a) (1) ("[n]o person . . . shall . . . retain or maintain any structure . . . until such person . . . has secured . . . a . . . permit for such work"). Although we conclude that the current version of § 22a-361 does not apply retroactively to Shiling's activities for the same reasons that § 22a-363b (a) (2) does not apply retroactively, our conclusion has no effect on the defendant's separate and distinct ruling that Shiling was required to obtain a permit under the revision of § 22a-361 that was in effect in 1988.

[19] Thus, the plaintiffs' insistence in their reply brief to this court that the defendant, the trial court and the Appellate Court "all *explicitly* relied on the definitions of 'routine' and 'substantial maintenance' found in [General Statutes] §§ 22a-363a and 22a-363b in denying the [plaintiffs'] request to vacate the [notice of violation]"; (emphasis in original); finds absolutely no support in the record. The portions of the various decisions that the plaintiffs cite in support of this statement all relate to the denial of the plaintiffs' application for a certificate of permission.

[20] In their brief to this court, the plaintiffs appear to contend that, even if this court determines that the defendant properly relied on § 22a-363b (a) (2) in upholding the office's notice of violation, a structure has been "continuously maintained and serviceable" for purposes of that statute if the structure has been destroyed but the owner had no intent to abandon its use. We have concluded, however, that the rulings of the defendant, the trial court and the Appellate Court upholding the notice of violation were not based on § 22a-363b (a) (2), but were based on the revision of § 22a-361 that was in effect in 1988. Accordingly, the meaning of the phrase "continuously maintained and serviceable" as used in § 22a-363b has no direct bearing on the validity of the notice of violation. Nevertheless, because the defendant concedes that the revision of § 22a-361 that was in effect in 1988 did not require a permit for structures that had been continuously maintained in the same condition since June 24, 1939, the plaintiffs' claim that a structure should be deemed to have been in continuous existence unless the owner had an intent to abandon its use applies equally to § 22a-361. Accordingly, we construe the plaintiffs' claim to be that no permit is required under the revision of § 22a-361 that was in effect in 1988 if a structure that has existed since June 24, 1939, has been destroyed, but the owner had no intent to abandon the use of the structure.

We recognize that, as so construed, the plaintiffs' claim is not encompassed by the certified question, which concerns the proper construction of § 22a-363b (a). Moreover, the plaintiffs made no claim regarding the issue of "intent to abandon" in their petition for a declaratory ruling, and they have not indicated whether and, if so, where, they raised this claim elsewhere during the proceedings before the defendant. Although the plaintiffs raised the abandonment claim in their briefs to the trial court and to the Appellate Court in connection with their claim that the defendant improperly construed § 22a-363b, those courts did not address it. Nevertheless, because the plaintiffs cannot prevail on this claim as a matter of law, we conclude that we may address it. See *Blumberg Associates Worldwide, Inc.* v. *Brown & Brown of Connecticut, Inc.*, 311 Conn. 123, 157–58, 84 A.3d 840 (2014) ("[r]eview of an unpreserved claim may be appropriate . . . when the minimal requirements for review are met and . . . the party who raised the unpreserved claim cannot prevail" [citation omitted; emphasis omitted; footnote omitted]).

Finally, we note that the plaintiffs make no claim that the defendant improperly upheld the notice of violation with respect to the boardwalk that Shiling installed in 1988 because a boardwalk had existed on the property on June 24, 1939.

[21] Indeed, the legislative history of § 22a-363b indicates that, prior to the enactment of that statute in 1990, the legislature intended that even the routine maintenance of existing structures that had been in place since June 24, 1939, would require a permit pursuant to § 22a-361. See 33 S. Proc., Pt. 4, 1990 Sess., p. 994, remarks of Senator Steven Spellman ("[U]nder current law, even simple maintenance of an existing structure requires a full blown hearing. Under this bill, simple maintenance of any dock or dredging under a permit could be done without the necessity of any certificate of permission, nor the necessity of a full blown hearing."); 33 H.R. Proc., Pt. 16, 1990 Sess., p. 5437, remarks of Representative Jay B. Levin ("[t]his legislation . . . create[s] for the first time . . . an expedited procedure for the granting of permits to conduct maintenance, that is, and repairs that are routine in

nature"); Conn. Joint Standing Committee Hearings, Environment, Pt. 3, 1990 Sess., p. 891, remarks of Jonathan Lovejoy, chairman of the Norwalk Harbor Management Commission ("under current law," department is not permitted "to allow routine repairs of storm damaged docks and floats without the applicant going through the whole process"). We need not decide in the present case, however, whether routine maintenance of a structure required a permit before the enactment of § 22a-363b because the defendant found that Shiling's activities did not constitute maintenance of the boardwalk and dock, but constituted a "complete rebuilding" of the structures, a finding that the plaintiffs do not challenge on appeal to this court.

The plaintiffs contend that "[n]ot once in the five year course of this litigation has the [department] come forward with a permit from the period 1985–1989 for repair of a pre-1939 dock that was damaged in Hurricane Gloria. This lack of permitting activity is strong evidence that no permits were required in 1987 to repair or reconstruct docks that pre-dated 1939." As we have indicated, however, the defendant expressly found that "some of the permit files produced in response to [Gail] Lane's [Freedom of Information Act request] did in fact involve the reconstruction or repair of residential docks"; see footnote 13 of this opinion; and that the plaintiffs had "failed to demonstrate that circa 1988 the department did not require or issue permits for the complete rebuilding of a pre-1939 dock or the installation of a wooden boardwalk as was done by . . . [Shiling]." The plaintiffs have not explained why we should disregard this factual finding. Accordingly, the plaintiffs have not established the factual predicate for this claim.

[22] R. Scott Warren, a former professor of botany at Connecticut College, prepared a report at the request of landowners whose property abutted the plaintiffs' property and it was submitted to the department on November 10, 2008, and, in turn, was entered as an exhibit in the proceedings on the plaintiffs' petition for a declaratory ruling. Warren observed in his report that there had been "apparent erosion of the eastern half of the marsh front" on a property adjacent to the plaintiffs' property. He further observed that, based on a 1980 aerial photograph of the area, it appeared that most of the marsh loss had occurred since that time. Warren opined that one cause of the erosion "may well be the large cribbing boxes supporting the [plaintiffs'] dock. Wave reflection or refraction off these boxes would be directed toward the marsh edge . . . magnifying any natural erosion that might have taken place."

[23] Under the current version of § 22a-363b (a) (2), when a structure has been continuously maintained and serviceable since 1995, the owner is not required to obtain a permit for "substantial maintenance" of the structure, which is defined to mean "rebuilding, reconstructing, or reestablishing to a preexisting condition and dimension any structure . . . ." General Statutes (Supp. 2014) § 22a-363a. Rather, such work is eligible for a certificate of permission. General Statutes (Supp. 2014) § 22a-363b (a) (2).

[24] Although § 22a-363a has been amended by the legislature several times since the events underlying the present case; see, e.g., Public Acts 2010, No. 10-106, § 11; those amendments have no bearing on the merits of this appeal. In the interest of simplicity, references herein to § 22a-363a are to the 2014 supplement of the statute.

[25] Although the plaintiffs refer to § 22a-363a in their reply brief, they do so only in connection with their claim that the defendant improperly applied the statute retroactively to Shiling's activities in 1988.

[26] We emphasize that the defendant did not conclude that the plaintiffs cannot install a boardwalk and dock on their property. Rather, she indicated that, after complying with the notice of violation, the plaintiffs could apply for "a permit for a structure that complies with all applicable requirements, respects their neighbor's littoral rights and minimizes impacts to the environment."